IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

DAVID PUCKETT,

       Plaintiff,

v.

BOARD OF TRUSTEES OF THE FIRST
BAPTIST CHURCH OF GAINESVILLE,
INC. and FIRST BAPTIST CHURCH OF
GAINESVILLE,

       Defendant.

CIVIL ACTION NO.
2:13-CV-00131-RWS-JCF

## NON-FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendants' Motion For Summary Judgment (Doc. 27); Defendants' Motion To Strike The Affidavit Of Joyce Puckett (Doc. 40); and Plaintiff's request to clarify the Court's April 17, 2014 Order (*see* Doc. 35 at 4). Defendants' motion to strike is **DENIED as moot**. It is further **RECOMMENDED** that Plaintiff's request to clarify the Court's Order be **DENIED** and that Defendants' motion for summary judgment be **DENIED**.

## PROCEDURAL HISTORY

Plaintiff David Puckett ("Mr. Puckett" or "Plaintiff") was employed as a maintenance worker by Defendants from 1997 until his termination in September 2012. (*See* Doc. 1 at ¶¶ 6-8). He and his wife Joyce Puckett ("Mrs. Puckett") filed this lawsuit on June 17, 2013, asserting claims arising from Defendants'

termination of Mr. Puckett's employment.   (Doc. 1).   Plaintiffs asserted the following claims: (1) Mr. Puckett's claim of discriminatory discharge pursuant to the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.*[1] and the Georgia Equal Employment for Persons with Disabilities Code ("GEEPDC") (First Claim For Relief); (2) Mr. Puckett's claim for failure to make a reasonable accommodation (Second Claim For Relief); (3) Mr. Puckett's retaliation claim under the GEEPDC (Third Claim For Relief); and (4) an intentional infliction of emotional distress claim on behalf of both David and Joyce Puckett (Fourth Claim For Relief).   (*See* Doc. 1 at ¶¶ 29, 32-34).   Defendants filed an answer to the Complaint (Doc. 3), and later filed a motion to dismiss the Complaint (Doc. 10).   District Judge Richard W. Story granted Defendants' motion in part and dismissed all of Plaintiffs' claims except for Mr. Puckett's Count I ADA discriminatory discharge claim.   (*See* Doc. 26).

Defendants have now filed a motion seeking summary judgment on Mr. Puckett's discriminatory discharge claim (Doc. 27), with supporting brief (Doc. 27-2), a statement of material undisputed facts (Doc. 27-1), and exhibits (Docs. 27-3 through 27-5).   Mr. Puckett submitted a response brief (Doc. 35), a response to

---

[1] All references to the ADA in this Report and Recommendation are to the Act as amended by the ADAAA.

Defendants' statement of material facts (Doc. 35-1), and Mrs. Puckett's affidavit (Doc. 35-2). Defendants filed a reply brief (Doc. 39) and a motion to strike Mrs. Puckett's affidavit (Doc. 40). Mr. Puckett responded to Defendants' motion to strike (*see* Docs. 41 and 41-1) and submitted an amended affidavit with notarized signature page to correct the deficiencies outlined in Defendants' motion (*see* Docs. 42 and 42-1). Defendants did not file a reply in support of their motion to strike.

With briefing complete, the undersigned turns to the merits of Defendants' motions.[2]

## DEFENDANTS' MOTION TO STRIKE JOYCE PUCKETT'S AFFIDAVIT (DOC. 40)

Defendants move to strike the Affidavit of Joyce Puckett that Mr. Puckett submitted in response to Defendants' motion for summary judgment (*see* Doc. 35-2) on the grounds that it is unsigned, undated, and unsworn. (Doc. 40-1 at 2). In response, Plaintiff explained that Joyce Puckett "did swear to the truth of the statements [in] her affidavit before a notary public," but then "noticed some error

---

[2] On August 8, 2014, after the parties completed briefing on the pending motions, Plaintiffs filed a notice indicating that their lawyer, John Devereux Marshall, had died on July 24, 2014 and that they were in the process of obtaining new counsel; they also notified the Court of their address. (*See* Docs. 43, 44). Mr. Puckett has not advised the Court that he has obtained new counsel, and therefore, he appears to be proceeding *pro se*. If Plaintiff has found counsel, that attorney is required to file a notice of appearance pursuant to LR 83.1D, NDGa.

in the affidavit." (Doc. 41 at 1). Plaintiff asserts that Mrs. Puckett then edited the affidavit "to correct the error," and her attorney "forgot to have Mrs. Puckett swear to the edited statement again." (*Id.* at 1-2). Plaintiff submitted an affidavit which included Mrs. Puckett's signature page, including her signature, date, and the signature and seal of a notary. (*See* Docs. 41, 41-1, 42 and 42-1). Defendants did not file a reply or object to the filing of the amended affidavit. Because Mrs. Puckett's initially filed affidavit (Doc. 35-2) does not appear to be signed or notarized, the Court will disregard it. *See, e.g.*, *Winkels v. Morales*, No. CV 310-076, 2012 U.S. Dist. LEXIS 117371, at *3-4 n.2 (S.D. Ga. July 25, 2012) (disregarding an affidavit that was not signed or notarized). Mr. Puckett has now submitted Mrs. Puckett's sworn statement given under oath before a notary public, and therefore Defendants' motion to strike is **DENIED as moot**.[3]

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 27)

### I.   Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[3] On reply, Defendants also object to certain statements in Mrs. Puckett's affidavit because they constitute inadmissible hearsay and involve incidents about which Mrs. Puckett did not have personal knowledge. (*See* Doc. 39 at 2-5). As discussed below, the undersigned finds that there are genuine issues of material fact based on the deposition testimony of Mrs. Puckett and other witnesses. Although the undersigned reviewed Mrs. Puckett's affidavit, it was unnecessary to rely on it to find genuine issues of material fact in dispute.

law."  FED. R. CIV. P. 56(a).  "A party asserting that a fact cannot be or is
genuinely disputed must support that assertion by[] . . . citing to particular parts of
materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations (including those made for
purposes of the motion only), admissions, interrogatory answers, or other
materials."  FED. R. CIV. P. 56(c)(1).  The moving party has an initial burden of
informing the court of the basis for the motion and showing that there is no
genuine issue of material fact.  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986);
*see also Arnold v. Litton Loan Servicing*, *LP*, No. 1:08-cv-2623-WSD, 2009 WL
5200292, at *4 (N.D. Ga. Dec. 23, 2009) ("The party seeking summary judgment
bears the burden of demonstrating the absence of a genuine dispute as to any
material fact." (citing *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th
Cir. 1999)).  If the non-moving party will bear the burden of proving the material
issue at trial, then in order to defeat summary judgment, she must respond by going
beyond the pleadings, and by her own affidavits, or by the discovery on file,
identify facts sufficient to establish the existence of a genuine issue for trial.  *See
Celotex*, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party
has failed to 'make a showing sufficient to establish the existence of an element . . .
on which that party will bear the burden of proof at trial.' "  *AFL-CIO v. City of*

5

*Miami*, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991), *cert. denied*, 506 U.S. 952 (1992); *see also* Fed. R. Civ. P. 56(c)(1)(B), (c)(4). The evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan*, 932 F.2d at 1577. Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984).

For a dispute about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. *Id.* at 249, 255. Rather, "[t]he evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

## II.  Facts

The facts, for summary judgment purposes only, are derived from Defendants' statement of undisputed material facts (Doc. 27-1, hereinafter "Def. SMF"), and Plaintiff's response to Defendants' statement of undisputed material facts (Doc. 35-1).[4]  The parties' factual assertions are taken primarily from the depositions of Joyce Puckett (Doc. 34, hereinafter "Puckett Dep.") and Dr. Kent Murphey (Doc. 36, hereinafter "Murphey Dep."), and to a lesser extent, the depositions of Dr. Richard Hunter (Doc. 37, hereinafter "Hunter Dep.") and Dr.

---

[4] Defendants correctly point out that Mr. Puckett did not file a separate statement of disputed material facts as required by LR 56.1B(2)(b), NDGa., and they argue that any additional facts he set out in his response to Defendants' statement of material facts or in his brief should not be considered by the Court.  (*See* Doc. 39 at 6).  Thus, Defendants contend, "the only material facts before the Court are those put forth by the Defendants."  (*Id.* at 7).  Defendants' contentions have some merit.  *See* LR 56.1B(1) & (2)(b).  Nevertheless, the undersigned has considered the materials cited by Defendants in support of their statement of material facts as well as the materials cited by Plaintiff in response to those statements, including Dr. Murphey's deposition testimony and Mrs. Puckett's deposition testimony, to determine whether genuine issues of material fact remain to be tried.  *See, e.g.*, *Walker v. United States*, No. 4:07-CV-0102-HLM, 2009 U.S. Dist. LEXIS 40097, at *8-9 (N.D. Ga. Feb. 26, 2009) (pointing out that plaintiff's response to the defendant's statement of material undisputed facts did not comply with LR 56.1, NDGa. which would ordinarily result in the court deeming defendant's statements as admitted, but nonetheless "examin[ing] the evidence in the record to determine whether a genuine dispute remains").  Furthermore, the undersigned has considered other evidence not necessarily cited to by the parties to provide background or context for the events at issue in this lawsuit.

William Coates (Doc. 38, hereinafter "Coates Dep."). Defendants did not depose Mr. Puckett because his psychiatrist, Dr. Hunter, testified that he is not competent to be deposed due to his mental condition (*see* Hunter Dep. at 18) and his wife testified that he does not know the difference between reality and non-reality (*see* Puckett Dep. at 102). (Doc. 27-2 at 6). The undersigned has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. The facts are construed in the light most favorable to Mr. Puckett as the non-movant. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1309 (11th Cir. 2001).

Dr. Kent Murphey has served on the staff of First Baptist Church of Gainesville ("the Church") as the Minister of Administration since 1992. (Def. SMF ¶ 1). Dr. Murphey hired Mr. Puckett to work in the maintenance department in the 1990s.[5] (Def. SMF ¶ 2). David Yarborough was Mr. Puckett's supervisor when he was hired, but later Bo Rodgers became his supervisor. (Murphey Dep. at 13, 20, 29). Mr. Puckett generally worked the evenings and weekend shifts. (*See* Murphey Dep. at 17). Dr. Murphey testified that Mr. Puckett was someone who "could handle the solitary hours of Saturdays and Sundays," "very responsible in

---

[5] Dr. Murphey explained that the maintenance department supervisor reviews the resumes and does the initial interview for applicants for maintenance employees, and then Dr. Murphey conducts interviews and makes hiring decisions with the maintenance supervisor. (Murphey Dep. at 13).

terms of showing up, working his shift and leaving, not before the end of his shift," and Dr. Murphey could count on him to follow through on instructions.  (Murphey Dep. at 14).

Dr. Murphey described his interactions with Mr. Puckett as "few and far between," mainly calling him on Saturday night to go over things that needed to be done for Sunday, like check the sanctuary air conditioning, or randomly seeing him working around the church.  (Murphey Dep. at 14-15, 17).  Dr. Murphey observed that Mr. Puckett avoided working around groups of people, and was "extremely shy and anxious around people or groups of people from the very beginning," which is "why he fit so well into the evening and the weekend" shifts, i.e., "[v]acant, non church program, non church event hours."  (*Id.* at 14, 16-17).  Dr. Murphey never saw evidence that Mr. Puckett was "hearing voices or having abhorrent [sic] thinking or having paranoia or seeming depressed so that he couldn't function."  (*Id.* at 18).  Instead, according to Dr. Murphey, Mr. Puckett "was showing up to work and was performing what he was willing to do with reliability to the very end."  (*Id.*).  Dr. Murphey did observe, and heard from others, that Mr. Puckett was "very upset" for about a month after his mother passed away in 2010.[6]  (*Id.* at 39-40).  He also testified that he heard that Mr. Puckett

---

[6] Dr. William Coates, the Senior Minister, testified that he knew that Mr. Puckett was depressed during his mother's illness and thereafter, and he asked Dr. Coates

expressed unhappiness about his life, but believed it related to his personal life, not mental illness.  (*Id.* at 70-71).

In spite of Dr. Murphey's generally positive assessment of Mr. Puckett's performance, he did issue a Personnel Warning to Mr. Puckett and another employee in the Maintenance Department, Kenny Davenport, on June 23, 2011 for using church-paid cell phones during working hours, having family members present during working hours, failing "to reliably complete assignments from your supervisor or communicate to him immediately when some circumstances prevent[ed them] from fulfilling [their] assignments," and inconsistently closing and securing the church facility at the end of their shifts.  (*See* Doc. 27-6).

On October 8, 2011, Mr. Puckett went to Northeast Georgia Medical Center, and was then hospitalized at Summit Ridge until October 13, 2011, after he took an overdose of Ativan (anti-anxiety medication), Ambien (sleep medication), and aspirin.  (Puckett Dep. at 85, 88-90).  The discharge summary indicated diagnoses of depressive disorder and alcohol dependence, among other things.  (*Id.* at 88-90).  Mrs. Puckett testified that she told Bo Rodgers, her husband's supervisor, that Mr. Puckett was in the hospital, that he had had a seizure, that his depression and

---

whether it was a "sin to commit suicide."  (Coates Dep. at 8-9).  Otherwise, Dr. Coates was not aware of "any kind of diagnosed problem or emotional problem" with Mr. Puckett, he just observed him to be shy and awkward around people.  (*Id.* at 9).

anxiety medications were not working, and he overdosed on them.  (*Id.* at 49).
When Mr. Puckett was released from the hospital, she told Mr. Rodgers "that
David had a mental illness and was on medications."  (*Id.* at 101).  Dr. Murphey
testified that he did not know that Plaintiff had a "mental breakdown" or was
hospitalized in Summit Ridge in the fall of 2011.  (Murphey Dep. at 38-39, 60).
Following his discharge from Summit Ridge, Mr. Puckett began treatment with Dr.
Richard Hunter, a board-certified neurologist and psychiatrist, who initially
diagnosed Plaintiff with a cognitive disorder and mood disorder, but eventually
diagnosed Plaintiff with schizophrenia on October 2, 2012.  (Hunter Dep. at 4-8).

In the summer of 2012, Mr. Rodgers and Dr. Murphey began asking Plaintiff
to clean classrooms that were going to be used during the day for a part-time
preschool program that was slated to become a full-time program that fall.
(Murphey Dep. at 37).   According to Dr. Murphey, he received reports from
maintenance personnel that Mr. Puckett refused to clean the classrooms, and Bo
Rodgers, Plaintiff's supervisor, also discussed with Dr. Murphey Plaintiff's
unwillingness to clean the classrooms.  (*Id.* at 37-38, 50, 56-57).  Plaintiff also
complained to Dr. Murphey that "Bo" was giving him more work than his previous
supervisor did, "and that's not fair," and Dr. Murphey told him that he needed to

do the work.[7]  (*Id.* at 59).   Mr. Puckett was completing his other tasks, which indicated to Dr. Murphey that Plaintiff "was not failing to perform when he chose to perform," but simply resisted taking on the "new task" of cleaning the classrooms for the preschool.  (*Id.* at 58).  Dr. Murphey did not take any action at first, but then in the fall of 2012 when the preschool program became full-time and Mr. Puckett allegedly continued to refuse to clean the classrooms, the issue became "critical," and he and Bo Rodgers met with Plaintiff and terminated him on September 30, 2012.  (*Id.* at 58, 70, 81-83).  After Mr. Puckett told his wife he had been fired, Mrs. Puckett spoke with Dr. Murphey about her husband and his termination.  (*See* Murphey Dep. at 82-86; Puckett Dep. at 59-65).  The accounts of that conversation differ, as discussed in more detail below.

### III.   Mr. Puckett's Claims

#### A.   Plaintiff's Assertions Concerning ADA Retaliation Claim

In Plaintiffs' Complaint, they asserted the following claims against Defendants:  (1) Mr. Puckett's ADA and GEEPDC discriminatory discharge claims (Count I); (2) Mr. Puckett's failure to accommodate claim (Count II); (3) Mr. Puckett's GEEPDC retaliation claim (Count III); and (4) both Plaintiffs'

---

[7] Dr. Murphey testified that he believed Mr. Puckett had the time to clean the classrooms because new carpet had been installed in the spring of 2012, and therefore, Mr. Puckett "wasn't having to do all the floor machine work" he had been doing.  (Murphey Dep. at 59).

intentional infliction of emotional distress claim (Count IV).  (Doc. 1 at ¶¶ 29, 32-34).  In his April 17, 2014 Order (Doc. 26), Judge Story granted Defendants' motion to dismiss all of Plaintiffs' claims except Mr. Puckett's ADA discriminatory discharge claim:  "Plaintiff's discriminatory discharge claim under the ADA (Count I) remains.  All other claims are hereby dismissed."  (*Id.* at 13-14).

In response to Defendants' motion for summary judgment, Mr. Puckett now asserts that he also brought a retaliation claim under the ADA, which he contends remains pending.  (*See* Doc. 35 at 1-2).  He submits that "[t]he court did not dismiss the retaliation claim based on the ADA," while acknowledging that "the order seems to say that all claims were dismissed except for the unlawful discharge claim."  (*Id.* at 2).  The undersigned disagrees with Plaintiff's contentions.  Plaintiffs' Complaint set out the four claims listed above, as Judge Story found in his Order (*see* Doc. 26 at 4), but did not allege an ADA retaliation claim.  In setting out Mr. Puckett's retaliation claim (Count III), Plaintiffs alleged:

> Defendants engaged in unlawful retaliation against Plaintiff, David Puckett, in violation of the Georgia Equal Employment for Persons with Disabilities Code, O.C.G.A. § Section 34-6A-5, by stopping payment on his severance pay check, by refusing previously promised financial assistance and in other ways to be proved by evidence at trial.  As a consequence thereof Plaintiff has suffered a loss of income, mental pain and suffering, mental injury, medical expense and other losses to be proved by evidence at trial.

(Doc. 1 at ¶ 33).   The above-quoted language is the entirety of Mr. Puckett's retaliation claim; it contains no mention of the ADA.

Mr. Puckett argues however that, while "[i]t may have be[en] in-artful drafting not to mention the ADA in the count entitled retaliation," that deficiency "is merely a mistake in form, not of substance."  (Doc. 35 at 3).  He points out that he otherwise alleged that Defendants retaliated against him in violation of the ADA, including in the first paragraph of the Complaint, paragraph 24 of the Complaint, and in the prayer for relief.  (*Id.* at 2-3).  The undersigned finds that the Complaint's stray references to retaliation under the ADA are insufficient to put Defendants or the Court on notice that Mr. Puckett was asserting an ADA retaliation claim in Count III.  Moreover, to the extent that Mr. Puckett intended to assert an ADA retaliation claim in the Complaint—or thought he had done so— Defendants' motion to dismiss should have put him on notice that he had not.  (*See generally* Doc. 10-1).  Plaintiffs did not assert that they were alleging an ADA retaliation claim in their response to the motion to dismiss (*see* Doc. 14), nor did Mr. Puckett seek to amend the Complaint to add such a claim.  Moreover, Judge Story's April 17, 2014 Order clearly put Mr. Puckett on notice that the Court did not read the Complaint to include an ADA retaliation claim, and unambiguously concluded that the only claim going forward was Mr. Puckett's ADA discriminatory discharge claim.  (*See* Doc. 26).  If Mr. Puckett believed the Court's

reading of the Complaint to be in error, he could have sought reconsideration of Judge Story's Order within 28 days after its entry, *see* LR 7.2E, NDGa., or even sought to amend the Complaint at that time, but he did neither.  Instead, he waited until his June 17, 2014 response, two months after Judge Story's Order, to raise the issue of his alleged ADA retaliation claim.  The undersigned finds that Plaintiff's request for the Court "to clarify its order to the effect that . . . David Puckett's ADA retaliation claim remains in this case" (Doc. 35)—made in response to Defendants' motion for summary judgment—is untimely and without merit.  It is therefore **RECOMMENDED** that the request be **DENIED**.

### B.   Mr. Puckett's ADA Discriminatory Discharge Claim (Count I)

Plaintiff alleges that Defendants discharged him because of his mental illness in violation of the ADA.  (Doc. 1 at ¶ 29).

### 1.   Analytical Framework

"The ADA prohibits an employer from discriminating against a 'qualified individual on the basis of disability.' " *McCarroll v. Somerby of Mobile, LLC*, No. 14-11040, 2014 U.S. App. LEXIS 23356, at *4 (11th Cir. Dec. 12, 2014) (quoting 42 U.S.C. § 12112(a)).  "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases."  *Wascura v. City of S. Miami*, 257

F.3d 1238, 1242 (11th Cir. 2001).[8]  In order to establish a *prima facie* case, the plaintiff must satisfy the following elements: (1) that he has a disability within the meaning of the ADAAA; (2) that he is qualified to perform the job, i.e., that with or without reasonable accommodations, he can perform the essential functions of his job; and (3) that he was discriminated against because of his disability.  *See Vaughan v. World Changers Church Int'l, Inc.*, No. 1:13-CV-0746-AT, 2014 U.S. Dist. LEXIS 141912, at *3 (N.D. Ga. Sept. 16, 2014) (citing *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014)).  "If the plaintiff meets his prima facie burden, and the defendant presents a legitimate, non-discriminatory reason for its actions, the plaintiff may then demonstrate that the reason given was a pretext for disability discrimination."  *Ward v. UPS*, 580 Fed. Appx. 735, 740 (11th Cir. 2014) (unpublished decision).

## 2.    *Prima Facie* Case

Defendants contend that Plaintiff has not pointed to any direct evidence of disability discrimination, and also cannot establish the *prima facie* case necessary to make out a circumstantial case of discrimination.   (Doc. 27-2 at 8-9).

---

[8] "In 2008, Congress enacted the ADA Amendments Act of 2008, which became effective January 1, 2009." *Dulaney v. Miami-Dade Cnty.*, 481 Fed Appx. 486, 489 n.3 (11th Cir. 2012) (unpublished decision). "Despite the changes brought about by the ADAAA, courts still utilize the same McDonnell Douglas burden-shifting analysis used in ADA and Title VII cases." *Beatty v. Hudco Indus. Prods., Inc.*, 881 F. Supp. 2d 1344, 1351 (N.D. Ala. 2012).

Defendants do not dispute that Mr. Puckett was a qualified individual under the ADA: "[i]n fact, it is the Church's position that despite being a qualified individual, David Puckett simply refused to do the work he was qualified to do." (*See id.* at 12). They argue, however, that Mr. Puckett cannot satisfy the other elements of his *prima facie* showing—he cannot show he had a disability when he worked at the Church, and he cannot show that he was terminated because of his disability. (*Id.* at 9-12). Mr. Puckett contends that he has produced direct evidence of disability discrimination, i.e., Mrs. Puckett's testimony about Dr. Murphey's statements he allegedly made to her on the day he terminated Mr. Puckett, discussed in more detail below. (*See* Doc. 35 at 5-6). Alternatively, he contends that that evidence, as well as other circumstantial evidence, creates genuine issues of material fact on the elements of his *prima facie* case. (*See id.* at 6-11).

It is unnecessary to resolve the issue of whether Mrs. Puckett's testimony about Dr. Murphey's explanation of Mr. Puckett's termination constitutes direct evidence because, as discussed below, the undersigned finds that it is at least circumstantial evidence sufficient to create a genuine issue of material fact on whether Defendants terminated Mr. Puckett because of a mental disability.

### a.   <u>Whether Mr. Puckett Had A Disability Within The Meaning Of The ADAAA</u>

Under the ADAAA, the term "disability" means, "with respect to an individual--:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1). "For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3). The ADAAA further provides that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). "[B]y enacting the ADAAA in 2008, Congress eased in part the evidentiary burden on ADA plaintiffs," and "announced that 'the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.' " *Vaughan*, 2014 U.S. Dist. LEXIS 141912, at *24 (quoting *Mazzeo*, 746 F.3d at 1268); *see also Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1374 (N.D. Ga. 2012) ("The ADAAA amended the ADA to, among other things, promulgate a more liberal standard of the term 'disabled,' making it significantly easier for a plaintiff to show disability." (quotation omitted)). One of the ways that Congress "eased . . . the evidentiary

18

burden on ADA plaintiffs" was to "change[] the definition of 'disability' such that being 'regarded as' having a disability no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity."  *Dulaney v. Miami-Dade Cnty.*, 481 Fed. Appx. 486, 489 n.3 (11th Cir. 2012) (unpublished decision).

Defendants contend that Mr. Puckett does not meet the ADAAA's definition of disability because: (1) Mr. Puckett did not have a physical or mental impairment that substantially limited one or more of his major life activities when he worked for the Church; (2) he did not have a record of an impairment that substantially limited one or more major life activities; and (3) he was not regarded as having an impairment.  (Doc. 27-2 at 9-12).  In making these assertions, Defendants point out that Dr. Hunter did not diagnose Mr. Puckett with schizophrenia until after he was terminated by the Church (*see* Hunter Dep. at 8), and assert that "there is no evidence that he had a physical or mental impairment at any time."  (Doc. 27-2 at 9-10).  Defendants contend further that Mr. Puckett's alleged impairment did not substantially limit any major life activities, arguing that Mr. Puckett "satisfactorily perform[ed] the tasks he was willing to do.  He simply balked at the task of cleaning the classrooms."  (*Id.* at 10).  Finally, Defendants assert that Dr. Murphey did not know Mr. Puckett was schizophrenic until after he was terminated: Mrs. Puckett did not tell him until that day that her husband was schizophrenic, and Dr.

Hunter had not even diagnosed him with the condition at that point. (*See* Doc. 27-2 at 11).   Defendants also argue that Dr. Murphey did not regard Mr. Puckett as disabled, noting Dr. Murphey's testimony that he simply thought Mr. Puckett was shy and preferred not to be around groups of people.  (*See id.*).

The undersigned finds that a genuine issue of material fact exists on whether Mr. Puckett had a disability as defined by the ADAAA, in particular whether he was "regarded as" having an impairment pursuant to 42 U.S.C. §§ 12102(1)(C) and 12102(3)(A).  As an initial matter, the fact that Plaintiff was not diagnosed with schizophrenia until after he was terminated is not dispositive.  The record contains evidence that Plaintiff suffered and was treated for mental impairments while he worked for the Church.  Mrs. Puckett testified that Mr. Puckett has had a mental illness for as long as she has known him—30 years—and a history of abusing his medications.  (Puckett Dep. at 84).  Dr. Hunter, a board-certified psychiatrist and neurologist, began treating Mr. Puckett in November 2011 after he was discharged from Summit Ridge (Hunter Dep. at 4-8), but while he still worked for the Church.  Dr. Hunter felt that Mr. Puckett had schizophrenia, "but he didn't come up with the symptoms," so he diagnosed Mr. Puckett with precursors to schizophrenia, such as cognitive disorder and mood disorder.[9]  (*Id.* at 7-8).  Dr. Hunter testified that

---

[9] Dr. Hunter first diagnosed Plaintiff with schizophrenia October 2, 2012.  (*Id.* at 8).

Plaintiff's hospitalization at Summit Ridge was his "third mental hospital admission," and noted that he had a "heavy history of substance abuse and addiction." (*Id.* at 10). He described Mr. Puckett as a "treatment-resistant schizophrenic," and testified that he still has a lot of impairments, including brain damage, in spite of treatment, which includes taking the maximum doses of anti-psychotic, anti-anxiety, and anti-depressant medications. (*Id.* at 17, 24). Mr. Puckett has also had hallucinations since childhood and in Dr. Hunter's opinion has been deteriorating for a long time. (*Id.*).

Furthermore, there is evidence that Plaintiff's supervisor, Bo Rodgers, who reported Plaintiff's alleged refusal to clean preschool classrooms to Dr. Murphey and appears to have been involved in his termination (*see* Murphey Dep. at 56-58, 70, 83), knew that Plaintiff had a mental impairment. Mrs. Puckett testified that she told Mr. Rodgers about her husband's hospitalization in October 2011 for overdosing on his depression and anxiety medications because they were not working, and she told Mr. Rodgers that her husband had a mental illness. (*See* Puckett Dep. at 48-49, 101).[10] Moreover, there is evidence, though disputed, that Dr. Murphey perceived Plaintiff to have a mental impairment. Mrs. Puckett testified that on the day of her husband's termination, Dr. Murphey told her that he fired Mr. Puckett because he could not "mentally" perform the "extra tasks" that

---

[10] Mr. Rodgers was not deposed and has not provided an affidavit or declaration.

21

the Church had given him to perform.  Her testimony about her conversation with

Dr. Murphey is as follows:

> And I asked him if it's true [that her husband had been fired], and he
> said, "Yes, it's true, . . . we let David go."  And I was crying and I was
> upset, and I'm like, "I don't understand why."  And he's like, "Well,
> with these extra tasks, David just can't do it."  And I said, "You mean
> he's not doing his work?"  He said, "No, he's doing his job that he's
> done for 15 years and he does it really good, but," he says, "when we
> add these other tasks on, he can't do it."  And I say[], "Can he
> physically not do it or can he mentally not do it?" And he says, "He
> can mentally not do it."  He said, "It's mental."

(Puckett Dep. at 63-64).  Mrs. Puckett stated that she then told Dr. Murphey, "You

know David has schizophrenia and is on a lot of medications," and Dr. Murphey

responded, "Oh, yes, I know all about schizophrenia" because Murphey's brother

has schizophrenia.  (*Id.* at 64).  According to Mrs. Puckett, she told Dr. Murphey,

"Well, you know David can't do all these tasks.  He can only do what he's been

used to doing for 15 years," and Dr. Murphey responded, "I know this . . . .  The

best thing you can do is get David on disability.  That's what you need to do, get

David on disability."  (*Id.* at 64-65).

Dr. Murphey denies that he knew that Mr. Puckett had a mental illness or

treatment before he terminated him (*see* Murphey Dep. at 18, 38-39, 60), and he

disputes Mrs. Puckett's version of their September 30, 2012 conversation (*see id.*

at 82-83).  Specifically, he denies that Mrs. Puckett asked him for the reason her

husband was fired or whether her husband was fired because of his physical or

mental problems, and he denies telling her that "it was his mental ability that was the problem[.]"  (*Id.* at 82).  He admits she told him that Mr. Puckett was on several medications, but his account varies from hers with respect to the idea of getting her husband on disability.  (*Id.* at 84-85).  Rather than recommending that she get Mr. Puckett on disability as Mrs. Puckett testified, Dr. Murphey testified that she said she wanted to try and get him on disability, and Dr. Murphey responded, "well, I know about that and I want to tell you, you will need a doctor to claim that with Social Security because I've had that in my family with my brother and it takes a doctor to recommend that to Social Security." (*Id.*).  He also admitted that he told her that his brother has schizophrenia.  (*Id.* at 85).

Defendants did not acknowledge Mrs. Puckett's testimony or address the disputed testimony about Mrs. Puckett's September 30, 2012 conversation with Dr. Murphey in their initial brief in support of their motion for summary judgment, other than to point out that Mrs. Puckett told Dr. Murphey for the first time that her husband was schizophrenic.[11]  (*See* Doc. 27-2 at 5, 11, 12).  Instead, they waited until after Plaintiff responded to address it in their reply.  (*See* Doc. 39 at 7-11). Therein, they contend that Mrs. Puckett's testimony does not constitute direct evidence of discrimination (*see id.* at 7-10), and that it shows that Plaintiff "was

---

[11] This omission is puzzling given Plaintiffs' reliance on this conversation in their Complaint (*see* Doc. 1 at ¶¶ 15-16), and Mrs. Puckett's deposition testimony about it (*see* Puckett Dep. at 55, 59, 63-67).

not qualified for the job," because he "could not handle the tasks assigned to him" (*see id.* at 10).   As indicated above, the Court need not address whether the testimony constitutes direct evidence of discrimination, and therefore, Defendants' contentions on that point are not material to the resolution of their motion.

The undersigned also finds Defendants' assertion that Mrs. Puckett's testimony shows that Plaintiff is not qualified to be without merit.   In the first place, Defendants conceded that element in their initial brief (*see* Doc. 27-2 at 12); if they believed Mrs. Puckett's testimony shows that Plaintiff was not qualified, they should have argued that point in their initial brief.   In addition, Defendants have not shown that Dr. Murphey's alleged statements that Plaintiff was unable to perform the "extra tasks" of cleaning the preschool classrooms irrefutably demonstrates that Plaintiff was not a "qualified individual" as defined in the ADA. Under the Act, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8) (emphasis added).   "Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position."   29 C.F.R. § 1630.2(n).  Defendants offer no analysis of whether cleaning preschool classrooms was an "essential function" of Plaintiff's job (*see* Doc. 39 at 10), a determination that is made by "examining a number of factors" on a "case-by-case basis."

*Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014).  Factors a court should consider include, among many others: the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent on the job performing the function; and the consequences of not requiring the employee to perform the function.  *See id.*  Defendants do not address those or other factors set out in the ADA and regulations in asserting in their reply that Mr. Puckett was not a qualified individual.  Thus, they have not demonstrated that no genuine issue of material fact exists on that element of the *prima facie* case.  Further, the undersigned finds that there at least a genuine issue of material fact on whether cleaning preschool classrooms on a regular basis was an essential function of Plaintiff's job where Dr. Murphey and Mr. Rodgers assigned that task to Plaintiff after he had worked for the Church for approximately 15 years, and where Mrs. Puckett testified that Dr. Murphey referred to it as an "extra" or "add[ed]" task.

Critically, Defendants failed in their initial or reply briefs to show why Mrs. Puckett's testimony does not constitute at least circumstantial evidence of Dr. Murphey's awareness of Mr. Puckett's mental impairment, his belief that Plaintiff had a disability, and his consideration of that disability in deciding to terminate Mr. Puckett.  Viewing Mrs. Puckett's testimony in the light most favorable to Plaintiff, as is required, the undersigned finds that Mrs. Puckett's testimony—that Dr.

Murphey said he fired Mr. Puckett because he was not mentally capable of performing the "extra tasks" he had been assigned, and that Dr. Murphey recommended to her that she get disability benefits for Mr. Puckett—is sufficient to at least create an issue of fact on whether Mr. Puckett had a disability as defined in 42 U.S.C. § 12102(1)(C), i.e., was "regarded as having such an impairment." That definition requires that Plaintiff "establish that he . . . has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §12102(3)(A).   The undersigned finds that Mrs. Puckett's testimony about Dr. Murphey's alleged statements concerning the reason he fired Defendant arguably satisfies that definition for purposes of summary judgment.   That testimony indicates that Dr. Murphey knew that Mr. Puckett had a mental impairment that interfered with his ability to work to the point where Dr. Murphey allegedly believed that Mr. Puckett qualified for disability benefits. Accordingly, an issue of fact exists on whether Mr. Puckett had a disability under the ADAAA.[12]

---

[12] The Court need not determine whether Mr. Puckett has also shown that he meets the other definitions of "disability" in the ADAAA, i.e., 42 U.S.C. § 12102(1)(A) & (B).   Furthermore, because the "regarded as" definition no longer requires an ADA plaintiff to show that his employer perceived him to be substantially limited in a major life activity, the Court need not reach the issue of whether Plaintiff's

**b.**    **Whether Mr. Puckett Was Terminated Because Of A Disability**

Defendants argue that Mr. Puckett cannot establish the third element of his *prima facie* case, i.e., that he was terminated because of his disability, because "the Church did not have knowledge of David Puckett having an alleged disability." (Doc. 27-2 at 12).  Defendants again cite the fact that Dr. Hunter did not diagnose Mr. Puckett with schizophrenia until after he was fired.  (*Id.*).  As already explained, even if persons involved in the termination decision, i.e., Mr. Rodgers and Dr. Murphey, did not know that Mr. Puckett was schizophrenic, the record contains evidence that could support a finding that Mr. Rodgers knew that Plaintiff had a mental illness for which he took depression and anxiety medications, and that Dr. Murphey believed that Mr. Puckett was mentally impaired and should pursue disability benefits, as discussed above.  Furthermore, Mrs. Puckett's testimony about her conversation with Dr. Murphey creates an issue of fact on whether Dr. Murphey terminated Mr. Puckett because of his mental inability, actual or perceived, to perform those tasks.  (*See* Puckett Dep. at 59, 63-65). Accordingly, the undersigned finds that Plaintiffs have created an issue of fact on whether Defendants terminated Mr. Puckett because of a disability sufficient to satisfy the third element of his *prima facie* case for purposes of summary

---

impairment substantially limited him in a major life activity or whether his employer believed that it did.  *See* 42 U.S.C. § 12102(3)(A).

judgment.   Because Mr. Puckett has shown a *prima facie* case of disability discrimination for purposes of summary judgment, the burden now shifts to Defendants to articulate a legitimate, non-discriminatory reason for terminating him.

<strong>3.   Whether Defendants Have Articulated A Legitimate, Non-Discriminatory Reason For Terminating Mr. Puckett</strong>

Defendants' "burden, one of production and not of persuasion, is 'exceedingly light.' " *Scott v. Shoe Show, Inc.*, No. 1:12-cv-03286, 2014 U.S. Dist. LEXIS 115332, at *32-33 n.25 (N.D. Ga. June 26, 2014).  Defendants contend that Dr. Murphey terminated Mr. Puckett because he refused to clean the preschool classrooms after the Church's preschool program expanded, as Dr. Murphey testified.  (*See* Doc. 27-2 at 13; *see also* Murphey Dep. at 37-38, 50, 56-58, 70).  Defendants assert that Mr. Puckett "was able to do the work as he had been relieved of other responsibilities," and denies that Dr. Murphey "increased David Puckett's workload."  (*See* Doc. 27-2 at 13; Doc. 39 at 9; Dr. Murphey Dep. at 59).  Defendants further contend that, although Mr. Puckett was capable of performing his assigned tasks, he was simply unwilling to clean the preschool rooms.  (*See* Doc. 27-2 at 13; Murphey Dep. at 50, 57-58, 70).  The undersigned finds that Defendants have met their "exceedingly light" burden to articulate a legitimate, non-discriminatory reason for terminating Mr. Puckett.   To survive summary judgment, Plaintiffs must produce evidence sufficient to create a triable issue of

28

fact on whether Defendants' articulated reason for terminating him was a pretext for discrimination.

### 4.    Whether Plaintiff Has Produced Evidence Of Pretext

Because Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiff, to survive summary judgment, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997)).  The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotation omitted).  In making the required pretext showing, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030.  Rather, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the

employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*

The undersigned finds that Plaintiff has met this burden. In particular, Mrs. Puckett's testimony about Dr. Murphey's conversation with her after he fired Mr. Puckett creates an issue of fact as to whether his articulated reason for terminating Mr. Puckett was untrue. First, contrary to Defendants' assertions that Dr. Murphey did not increase Plaintiff's workload (*see* Doc. 39 at 9), according to Mrs. Puckett's account, Dr. Murphey stated that he had assigned "*extra* tasks" to Mr. Puckett, and that "when we *add* these other tasks on, he can't do it." (*See* Puckett Dep. at 63-64(emphases added)). Critically, while Dr. Murphey testified that he believed that Mr. Puckett was able to clean the classrooms but willfully refused to do so (*see* Murphey Dep. at 37-38, 50, 56-58, 70), Mrs. Puckett's testimony about Dr. Murphey's explanation for the termination indicates that Dr. Murphey believed that Plaintiff was *not able* to clean the classrooms. That testimony undermines Dr. Murphey's asserted reliance on Mr. Puckett's alleged *unwillingness* or *refusal* to perform the work in making the decision to terminate him. Mrs. Puckett's testimony that Dr. Murphey told her that he fired Mr. Puckett because he was not mentally able to perform the "extra tasks" and recommended that Mr. Puckett go on disability creates an issue of fact on whether Dr. Murphey terminated Mr. Puckett for the reasons he gave during his deposition or because of Mr. Puckett's

actual or perceived disability.  Accordingly, the undersigned finds that Plaintiffs have created a genuine issue of material fact on whether Defendants' articulated legitimate, non-discriminatory reason for terminating Mr. Puckett was a pretext for disability discrimination.

Because genuine issues of material fact preclude the granting of summary judgment to Defendants, it is **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 27) be **DENIED**.

## CONCLUSION

Defendants' motion to strike Joyce Puckett's Affidavit (Doc. 40) is **DENIED**.  It is **RECOMMENDED** that Plaintiffs' request to clarify the Court's April 17, 2014 Order (*see* Doc. 35 at 4) be **DENIED**.   It is further **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 27) be **DENIED**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 5th day of January, 2015.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge